

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-16-2004

# UPMC Health Sys v. Metro Life Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 03-3677

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"UPMC Health Sys v. Metro Life Ins Co" (2004). *2004 Decisions.* Paper 15.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/15

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-3677

———

*UPMC HEALTH SYSTEM, a
Pennsylvania non-profit corporation
<u>Appellant</u>

v.

METROPOLITAN LIFE INSURANCE
COMPANY, a Delaware Corporation

*(Amended in accordance with Clerk's Order dated 3/15/04)

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 01-cv-00147)
District Judge: Honorable Arthur J. Schwab

———

Argued September 28, 2004

———

Before: ROTH, BARRY, and GARTH, <u>Circuit Judges</u>.

(Filed   December 16, 2004)

Anthony Cillo, Esq. (Argued)
Richard R. Nelson, Esq.
Cohen & Grigsby
11 Stanwix Street, 15th Floor
Pittsburgh, PA   15222

<u>Attorneys for Appellant</u>

Daniel E. Wille, Esq. (Argued)
Darren P. O'Neill, Esq.
Reed Smith, Esq.
435 Sixth Avenue
Pittsburgh, PA   15219

<u>Attorneys for Appellee</u>

---

OPINION OF THE COURT

---

**BARRY, <u>Circuit Judge</u>**

In this case, we are asked to review the grant of summary judgment in favor of an insurer and damages awarded by the District Court to the insurer.  For the reasons that follow, we will affirm in part, reverse in part, and remand for further proceedings.

## I.  BACKGROUND

UPMC Health System ("UPMC"), a nonprofit corporation that operates a system of hospitals and health care facilities, negotiated with Metropolitan Life Insurance Company ("MetLife") for an umbrella dental insurance policy for all of UPMC's employees.  On July 29, 1999, MetLife issued a written quote for a one-year insurance policy for a "High Option" dental plan.  UPMC rejected this proposal, requested changes, and MetLife issued a revised proposal, dated August 26, 1999.  This revised proposal included dual option coverage, whereby employees would be able to choose between High Option and Low Option plans, and a two-year coverage commitment and rate guarantee, which provided that the rates for the second year of coverage would be no more than 5% higher than the rates for the first year.[1]

---

[1]MetLife had offered maximum renewal increases such as this before, and so this aspect of the proposal was not unique.

2

Because MetLife could not know in advance how many UPMC employees would choose the High Option versus the Low Option, its revised proposal included rates 5.5% higher to account for this risk, although it based its calculations on an assumed 75/25 split between the High and Low Options. It also increased its rates by 1.5% to account for the increased risk associated with its two-year, as opposed to its original one-year, commitment. Important for this appeal, the proposal included a reservation of rights provision that stated:

> Notwithstanding any rate guarantee, we reserve the right to change our rates for any of the following reasons:
>
> a.     The composition of the group, employees, dependents or life insurance volume, has changed 10% or more from the composition when quoted
> b.     The financial arrangement on any part of the package is changed
> c.     Any of the coverages are cancelled or not issued
> d.     Any of the plan designs are changed

(49a, 56a.) This revised proposal was to remain in effect until January 1, 2000.

UPMC accepted the revised proposal in September 1999. Its employees were thereby required to enroll in MetLife's plan before January 1, 2000 in order to be covered in 2000. Enrollment was complete in November, with a 90/10 split between the High Option and the Low Option, which fact MetLife knew prior to the commencement of coverage on January 1. Policy number 101491-G issued and became effective on January 1, 2000.

The policy was a form policy for one year, and included only the first year rates, not the second year rates or guarantee. MetLife's standard practice was to issue form policies such as this regardless of negotiated multi-year rate guarantees. The

3

policy, however, included a "Changes in Rate" section ("Section 6"), which stated:

> Metropolitan may change any or all of the premium rates if there is a change in the terms of this Policy. Metropolitan may also change any or all of the premium rates (a) on the first day of each Policy Period which begins after the Date of Issue and (b) on any Premium Due Date following the date there has been a change, since the last day of the prior Policy Period, of 10% more in the number of Employees insured for Personal Insurance and/or Dependent Insurance under this Policy.

(67a.) The term "Policy Period" was defined as each calendar year, thereby giving MetLife the right to increase rates for the second year of coverage. It also included an integration clause (Section 14), titled "Entire Contract," which provided that "[t]his Policy and the application of the Employer constitute the entire contract between the parties. A copy of the application is attached to this Policy." (69a.) The copy of the policy provided to UPMC, however, did not contain the application, although it was included in the copy produced from MetLife's files. The application stated that, by signing it, the policyholder agreed that "[a]ll of the terms and conditions under which the insurance is to be provided will be set forth in the Group Policy (or Policies) issued." (521a.) UPMC never signed the application, and, it argues, never agreed that all of the terms of its contract with MetLife were set forth in the policy.

By June 2000, MetLife was losing money on the UPMC policy, and realized the mistake it had made during underwriting in entering data into its computer spreadsheet, causing it to quote rates at least 23% too low. Upon realizing this error, the MetLife Regional Vice President decided to "pull" the second year rate guarantee. MetLife calculated that, even if it did not try to recoup its year 2000 losses, it would need a 69.7% rate increase to reach its profitability goals for 2001. In July 2000, MetLife tried to convince UPMC to accept higher rates for the

4

second year of coverage because it was losing money on the policy, and because it claimed that UPMC had not provided all of the data required during the quote process. By mid-September, MetLife conceded that it had been given the required data, and instead invoked its right to increase the rate because the number of "lives" had changed by 10%. It soon abandoned this justification, and, instead, on September 26, 2000, invoked its right under the August 26 revised proposal to increase the rate because the "composition of the group" had changed sufficiently, and threatened a 57% increase.[2] Notably, MetLife did not then argue that the two-year rate guarantee was inapplicable because the policy was an integrated contract; it argued only that the provisions of that guarantee allowed it to unilaterally raise its rates because of the changed circumstances.

UPMC refused to pay the threatened rate increase, and on October 27, 2000, MetLife issued a renewal notice that called for a 55% rate increase. On December 22, 2000, UPMC informed MetLife that it would not accept any rate increase beyond 5%, and that it intended to enforce the two-year coverage commitment and rate guarantee. In response, MetLife informed UPMC that it would send a premium bill reflecting the 55% increase. UPMC paid only the 5% rate increase agreed to as a result of the August 26, 1999 revised proposal, although MetLife continued paying claims. During 2001, MetLife submitted premium bills to UPMC totaling $11,173,878.91, but UPMC remitted only $7,569,792.39 – a difference of $3,604,086.52.

On January 18, 2001, UPMC filed this action in the U.S. District Court for the Western District of Pennsylvania, seeking both a declaratory judgment that MetLife was contractually obligated to provide group dental insurance at a guaranteed rate for a two year period (Count One), and damages for conduct in violation of Pennsylvania's Bad Faith Statute, 42 PA. CONS. STAT. ANN. § 8371 (Count Two). MetLife counterclaimed for

---

[2]As one person at MetLife handling the account put it, "I agree that a law suit [sic] is bad given the circumstances, however another $2.5 million loss is significant . . . I think we all agree, that if can get out of the deal without egg on our face, we should." (594a.)

5

breach of contract, seeking damages for UPMC's refusal to pay the 55% rate increase.

On May 10, 2002, MetLife moved for summary judgment on liability. On August 4, 2003, the Hon. Arthur J. Schwab, to whom the case had been reassigned, issued a memorandum opinion and order granting MetLife's motion. Among other things, the District Court held that the policy was an integrated, enforceable contract that contained all of the terms of the parties' agreement in unambiguous terms. It concluded that the August 26, 1999 revised proposal could not be considered to defeat those clear terms, and that even if it could, the rate increase for 2001 was allowed under that proposal because there had been a sufficient change in the composition of the group of employees. The Court also dismissed UPMC's bad faith claim because it was not premised on MetLife's refusal to pay a claim. The parties were directed to either stipulate to damages, or to file position papers on damages.

On August 28, 2003, after the parties exchanged briefs on damages, the District Court awarded $4,062,229.03 to MetLife – the $3,601,950.81 in premiums UPMC refused to pay,[3] plus $460,278.22 in pre-judgment interest, and post-judgment interest at a rate of 6% in accordance with Pennsylvania law. UPMC appealed both the order of August 4th and the order of August 28th, 2003.

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A.    Summary Judgment on Liability

Our standard of review on summary judgment is well-established:

---

[3]The premium differential is $3,604,086.52, not the $3,601,950.81 figure computed by the District Court.

6

Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Wisniewski v. Johns- Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987). In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. Suders v. Easton, 325 F.3d 432, 435 n. 2 (3d Cir. 2003). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Singletary v. Pennsylvania Dept. of Corrections, 266 F.3d 186, 192 n. 2 (3d Cir. 2001) (quoting Celotex, 477 U.S. at 325, 106 S.Ct. 2548).

Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). On appeal, "[w]e apply the same standard that the District Court should have applied." Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 253 (3d Cir. 2004) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000)).

UPMC argues that, for various reasons, the District Court erred in granting summary judgment. We need not discuss all of those reasons because we are persuaded that the District Court erred as a matter of law in refusing to apply Pennsylvania's doctrine of reasonable expectations under which the agreed upon two-year rate guarantee is enforceable, and erred in resolving ambiguities and/or disputed facts vis-a-vis the "composition of the group" in MetLife's favor.

7

### 1. Is the Two Year Rate Guarantee Enforceable?

The Pennsylvania doctrine of reasonable expectations states that "[t]he reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents." Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1353 (Pa. 1978). It is intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy. See, e.g., Tonkovic v. State Farm Mut. Auto Ins. Co., 521 A.2d 920 (Pa. 1987) ("We hold that where, as here, an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy.").

We have recognized and applied this doctrine in cases where the insured reasonably expected certain coverage, even when those expectations were in direct conflict with the unambiguous terms of the policy. For example, in Bensalem Township v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303 (3d Cir. 1994), we reversed the dismissal of an insured's declaratory judgment action. The insurer had unilaterally expanded an exclusion in a professional liability insurance policy bought by the plaintiff. This expanded exclusion was unambiguously stated in the renewed policy, the insurer denied coverage based on it, and the District Court dismissed the insured's complaint because there was no ambiguity. We instructed the District Court to allow the plaintiff to proceed with discovery in an effort to demonstrate that the expanded exclusion was inconsistent with the insured's reasonable expectations. Relying upon the decisions of the Pennsylvania Supreme Court,[4] we stated that "where the insurer or its agent creates in the insured a reasonable

---

[4]Collister, supra; Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563 (Pa. 1983); and Tonkovic, supra.

expectation of coverage that is not supported by the terms of the policy that expectation will prevail over the language of the policy . . . an insurer may not make unilateral changes to an insurance policy unless it both notifies the policyholder of the changes and ensures that the policyholder understands their significance." Id. at 1311. See also Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 208, 213 (3d Cir. 2001) (reaffirming the viability of the reasonable expectations doctrine in coverage disputes); Medical Protective Co. v. Watkins, 198 F.3d 100, 106 (3d Cir. 1999) (although concluding that the exclusion clause at issue was ambiguous, we noted that the reasonable expectations of the insured control, "'even if they are contrary to the explicit terms of the policy'") (quoting West Am. Ins. Co. v. Park, 933 F.2d 1236, 1239 (3d Cir. 1991) (citing State Farm Mut. Auto Ins. Co. v. Williams, 392 A.2d 281, 286-87 (Pa. 1987))).

The District Court did not take issue with the fact, and fact it be, that the parties had agreed on a two-year rate guarantee. Rather, the Court held that the terms of the policy were clear and unambiguous, as was its integration clause, and, therefore, that parol evidence such as the August 26, 1999 revised proposal with its two-year rate guarantee "cannot be considered in determining the 'reasonable expectations' of the parties." 12a. As the above discussion should make clear, this conclusion is simply not supported by our caselaw or by the Pennsylvania cases on which we relied.

The District Court erred in another respect as well. The concern for the vulnerability of non-commercial insureds entering into adhesion contracts with large insurance companies clearly motivates the application of the doctrine of reasonable expectations. Nevertheless, we have predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance – i.e. "a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance." Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904-05, n.8 (3d Cir. 1997). This is so, we stated, when "the insurer unilaterally alters the insurance coverage requested by the insured," and,

9

thus, the insured "does not receive the actual insurance policy until after offering to buy insurance and paying the first premium." Id. at 905. Status as a sophisticated purchaser is a "factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered," but does not automatically disqualify it. Id. at 906. According to the District Court, however, because UPMC was a "sophisticated party" and the policy "a freely negotiated agreement entered into by parties of equal status," the doctrine of reasonable expectations was inapplicable. 13a. The District Court was wrong.

Neither any lack of ambiguity in the policy language nor UPMC's status as a sophisticated purchaser of insurance prevented application of the doctrine of reasonable expectations; indeed, the reasonable expectations of UPMC are not even questioned here at least insofar as UPMC and MetLife negotiated and agreed upon the rate guarantee for the second year of coverage.[5]

### 2.   Was There a 10% or More Change in the "Composition of the Group"?

Because the doctrine of reasonable expectations applies, we reject the District Court's conclusion that the terms of the policy clearly and unambiguously permitted MetLife to change its rates and, therefore, that the two-year rate guarantee was unenforceable. The District Court also concluded, however, that, even if it were to consider the two-year rate guarantee, MetLife's unilateral rate change was permissible because there was a 10% change in the "composition of the group," a phrase contained in the reservation of rights provision of the revised proposal, when the ratio of UPMC employees enrolled in the

---

[5]One further comment. While we recognize that Bensalem, its progeny, and the leading Pennsylvania Supreme Court cases such as Collister and Tonkovic are all coverage cases, we do not consider it an expansion of the doctrine of reasonable expectations to apply it to this dispute; indeed, the same logic that motivates the application of the doctrine in coverage cases motivates its application here.

10

High Option versus Low Option plans changed from 60/40 to 90/10.

UPMC argues that this change was not a change in the composition of the group, but rather a change in members' coverage choices. At the least, it argues, the term "composition of the group" is ambiguous, and should have been submitted to the jury for interpretation. UPMC also argues that the composition of the group did not change because MetLife knew of the 90/10 split before it issued the policy.[6] MetLife, for its part, successfully argued to the District Court that the phrase should be construed in accordance with its dictionary meaning and, so construed, the evidence showed that the composition of the group had changed by more than 10% and MetLife could raise its rates notwithstanding any rate guarantee.

We agree with UPMC, at least to the extent that "composition of the group" is ambiguous enough that it should have been left to the jury to determine what the parties meant by that phrase when they used it. UPMC's arguments in that regard and whether a change in the High/Low Option ratio was, in fact, a change in the "composition of the group" as that term was used in the revised proposal should not have been so quickly dismissed by the District Court. This dispute will be for a jury to decide.

Because we are reversing the grant of summary judgment on liability, it follows that we will vacate the award of damages and pre- and post-judgment interest to MetLife. We note, however, that if, following trial, there is to be an award of post-judgment interest, that award is to be calculated in

---

[6]UPMC argues, as well, that MetLife's right to change the rates based on a change in the composition of the group expired on December 31, 1999 when the August 26th revised proposal expired. This may be a self-defeating argument: if the proposal expired on December 31, then so did the rate guarantee included therein. But it just may have legs if one considers the expiration date as the date MetLife's offer exploded, not the date the terms therein were no longer enforceable if UPMC were to accept the offer.

11

accordance with 28 U.S.C. § 1961 and not in accordance with Pennsylvania law.

**B.    Summary Judgment on UPMC's Bad Faith Claim**

UPMC alleges that, in failing to disclose that its loss in the year 2000 was at least partly due to its own mistake in entering data onto a computer spreadsheet, MetLife violated the Pennsylvania Unfair Insurance Practices Act, PA. STAT. ANN. tit. 40 § 1171.5 ("UIPA"), specifically, subsection (a)(1)(vi), which defines a "misrepresentation for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion or surrender of any insurance policy" as an unfair or deceptive practice in the business of insurance.  This violation, UPMC argues, constitutes bad faith under Pennsylvania's Bad Faith Statute, 42 PA. CONS. STAT. ANN. § 8371 ("§ 8371"), which creates a private right of action in the event "an insurer has acted in bad faith toward the insured."

The District Court disagreed, and granted summary judgment in Met Life's favor.  It held that there was no issue of fact because the terms of the policy were clear and unambiguous. It added that any such bad faith claim must be predicated, under Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680 (Pa. Super. Ct. 1994), on a frivolous or unfounded refusal to pay the proceeds of a policy.  Given that UPMC's allegations did not involve any such refusal, no claim under § 8371 could be asserted.

With respect to the District Court's first reason, it is unclear to us why clear contract terms would necessarily preclude a bad faith claim under § 8371.  However clear the terms may be, MetLife may still have intentionally misrepresented facts to UPMC in an effort to avoid its obligations under the rate guarantee.

We agree, however, with the District Court as to the second reason.  The Pennsylvania Supreme Court, which held that there is no common law remedy for bad faith on the part of

12

insurers, see D'Ambrosio v. Pa. Nat'l Mutual Cas. Ins. Co., 431 A.2d 966, 970 (1981), has not articulated a standard for a claim under the subsequently enacted § 8371. In particular, it has not stated whether conduct that violates the UIPA constitutes bad faith on the part of the insurer for purposes of a § 8371 claim; rather, the leading case on § 8371, Terletsky, was decided by the Pennsylvania Superior Court. That Court explained that bad faith is "'any frivolous or unfounded refusal to pay proceeds of a policy,'" and that "'such conduct imports a dishonest purpose and means a breach of a known duty . . . through some motive of self-interest or ill will.'" Terletsky, 649 A.2d at 688 (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)). To recover under a claim of bad faith, then, UPMC must "show [1] that the defendant did not have a reasonable basis for denying benefits under the policy and [2] that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." Id.

Later decisions of the Pennsylvania Superior Court have applied the Terletsky standard. See O'Donnell v. Allstate Ins. Co., 734 A.2d 901 (Pa. Super. Ct. 1999); Cresswell v. Pa. Nat'l Mutual Cas. Ins. Co., 820 A.2d 172, 180 (Pa. Super. Ct. 2003). We, too, have done so. See Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225-26 (3d Cir. 2000); W.V. Realty v. Northern Ins. Co. of N.Y., 334 F.3d 306, 311-12 (3d Cir. 2003).

Applying Terletsky to this case, UPMC cannot rest its bad faith claim on the violations of the UIPA it alleges because MetLife's decision to conceal its miscalculation was intended, at most, to extract a higher premium from UPMC. There is no allegation that MetLife denied benefits; indeed, it paid benefits throughout 2001, even at a loss. While the alleged bad faith need not be limited to the literal act of denying a claim, see O'Donnell, 734 A.2d at 904 (bad faith during pendency of a lawsuit can violate § 8371 if intended to aid denying a claim), the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits. Cresswell, 820 A.2d at 180; see also Belmont Holdings Corp. v. Unicare Life & Health Ins. Co., No. CIV. A. 98-2365, 1999 WL 124389, at *2-3 (E.D. Pa. Feb. 5, 1999) (Terletsky and the legislative history of §

13

8371 limit that statute's reach to bad faith handling or payment of claims, and do not apply to disputes over contract terms). Thus, under Pennsylvania law, the District Court correctly determined that UPMC did not state a § 8371 claim.